**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

WESTHOFF VERTRIEBSGES MBH, a
German Limited Liability Company,

                                              Plaintiff,

        v.

CHRISTOPHER BERG, an individual;
BLUESKYE CREATIVE, INC., a
California Corporation,

                                              Defendants.

Case No. 22-cv-0938-BAS-SBC

**ORDER:**

**(1)  GRANTING PLAINTIFF'S
       CONVERTED RULE 12(b)(6)
       MOTION AND DISMISSING
       DEFENDANTS' AMENDED
       COUNTERCOMPLAINT (ECF
       Nos. 13, 29);**

**(2)  DISMISSING COUNTS 2
       THROUGH 8 OF PLAINTIFF'S
       COUNTERCOMPLAINT AND
       TERMINATING DEFENDANTS'
       RULE 12(b)(6) MOTION AS
       MOOT (ECF Nos. 21, 22); and**

**(3)  DENYING DEFENDANTS'
       MOTION TO STRIKE (ECF No.
       31)**

22cv0938

In 2014, Plaintiff Westhoff Vertriebsges mbH ("Westhoff"), a German-based flower breeding company, entered an oral independent services contract ("Contract") with San Diego-based marketing agency Defendant BlueSkye Creative, Inc. ("BlueSkye"), of which Defendant Christopher Berg ("Berg" and, together with BlueSkye, "Defendants") is the president. (*See* Second Am. Compl. ("SAC") ¶¶ 10–30, ECF No. 1-4.) Until 2018, Defendants provided Westhoff with a broad swath of marketing, advertising, and sales services, in exchange for $8,000 per month and reimbursement of out-of-pocket business expenses. Westhoff alleges that, in 2017, Defendants began embezzling funds that were earmarked for Westhoff-related costs to cover Berg's personal expenses. (*Id.* ¶¶ 13–19.) Westhoff further avers that Defendants forged financial statements to conceal their embezzlement and substantiate fraudulent business expenses. (*Id.* ¶¶ 20–30.) After discovering Defendants' purported embezzlement, Westhoff commenced suit. (*See generally id.*)

But the issues presently before this Court do not arise out of the marquee claims in this action. Instead, they pertain to a collateral but related dispute concerning Westhoff's continued use of marketing materials that contain photographs of Westhoff's flowers, which Berg took while BlueSkye served as Westhoff's lead North American marketing, advertising, and sales agent. Defendants claim Westhoff has no right to continue to use or distribute BlueSkye's materials now that it is no longer a client. Accordingly, in an Amended Countercomplaint, Defendants allege Westhoff has committed direct and indirect infringement under the Copyright Act and unfair business practices in violation of California Business and Professions Code § 17200. (*See* Defs.' Am. Countercompl. ("ACC") ¶¶ 37–56, ECF No. 13.) Westhoff retorts with its own Counterclaim. (*See generally* Pl.'s Counterclaim ("CC"), ECF No. 2.) That pleading asserts eight separate counterclaims. Most of those counterclaims seek declaratory judgments of non-infringement, effectively to invalidate Defendants' mirror image counterclaims of infringement under the Copyright Act. (Pl.'s CC ¶¶ 20–30.)

22cv0938

Now before the Court are two competing dispositive motions. Westhoff moves under Federal Rule of Civil Procedure ("Rule") 12(c) for judgment on the pleadings to dismiss for failure to state a claim Defendants' Amended Counterclaim. (Pls.' Mot., ECF No. 29; *see also* Mem. in Supp. of Pls.' Mot., ECF No. 29-1.) Defendants move under Rule 12(b)(6) for dismissal of Counts Two through Eight of Westhoff's Counterclaim. (Defs.' Mot., ECF No. 22; *see* Mem. in Supp. of Defs.' Mot., ECF No. 22-1.) In addition, Defendants also move to strike from the record Counts Two through Eight and their supporting allegations pursuant to California Code of Civil Procedure § 425.16, commonly known as the Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") law. (Anti-SLAPP Mot., ECF No. 31; *see* Mem. in Supp. of Anti-SLAPP Mot., ECF No. 31-1.) These motions all are fully briefed. (ECF Nos. 25–28, 32, 34–35.)[1]

The motions before the Court are suitable for determination on the papers submitted and without oral argument.[2] *See* Fed. R. Civ. P. 78(b); Civ.L.R. 7.1(d)(1). For the reasons set forth below, the Court: (1) **CONVERTS** Westhoff's Motion from a Rule 12(c) motion into a Rule 12(b)(6) motion; (2) **GRANTS** Westhoff's Motion (ECF No. 29) and **DISMISSES** Defendants' Amended Counterclaim (ECF No. 13); (3) **DISMISSES AS MOOT** Counts Two through Eight of Westhoff's Counterclaim (ECF No. 21) and **TERMINATES** Defendants' Motion to Dismiss Counts Two through Eight of Westhoff's

---

[1] Westhoff appears to misapprehend that its motion to dismiss Defendants' Initial Counterclaim, filed July 11, 2022 at ECF No. 7, still is pending. (*See* ECF No. 53 at 1:8–13.) It is not. That motion became moot when Defendants filed their Amended Counterclaim. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[A]n amended complaint supersedes the original, the latter being treated thereafter as nonexistent."), *overruled in part on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc).

[2] Westhoff moves unopposed for a Case Management Conference, which the Court construes as a request for a hearing on the pending Motions. (ECF No. 43.) Notably, neither Westhoff nor Defendants adhered to the typical procedures for seeking a hearing delineated in Section 4(B) of the Hon. Cynthia A. Bashant's Standing Order for Civil Cases, which requires the movant to request a hearing in the motion itself. Moreover, Westhoff does not explain what new circumstances necessitate a hearing. Rather, Westhoff appears to seek determination on the three, interrelated pending motions at a hearing, as opposed to by written order, so that it can obtain this Court's ruling on an expedited basis. Because the Court finds that a hearing is unnecessary given the briefing before it, the Court **DENIES** Westhoff's request. (ECF No. 43.)

22cv0938

Countercomplaint (ECF No. 22) and Westhoff's Motion for Leave to File a Sur-reply for the same reason; and (4) **DENIES** Defendants' Anti-SLAPP Motion (ECF No. 31).

## I.   BACKGROUND

### A.   Factual History[3]

Westhoff is a German-based, family-owned and operated flower breeding company. (SAC ¶ 9.)  It is "a well-respected finished grower and leading innovator in breeding genetics that benefit growers, retailers, and consumers alike in Europe, the United States, and all over the world."  (*Id.*)  Westhoff's Chief Executive Officer ("CEO") is Christian Westhoff, who is not a party in this case.  (Defs.' ACC ¶ 9.)  Berg, a San Diego resident, is the president of BlueSkye, "an award-winning marketing agency devoted exclusively to the horticulture market."  (*Id.* ¶ 1–2.)  He also is "an experienced photographer."  (*Id.* ¶¶ 2, 14.)

In 2014, Westhoff and BlueSkye entered an oral independent services contract (previously defined as "Contract").  (Defs.' ACC ¶ 10.)  The Contract contemplated that, "in exchange for $8,000 per month and reimbursement for out-of-pocket expenses," BlueSkye would "effectively handle[] the entirety of Westhoff's North American business operations," namely its marketing, advertising, and sales functions.  (*Id.* ¶ 12; SAC ¶ 93.) Specifically, the Contract called for BlueSkye to:  (1) "market and sell Westhoff products at trade shows"; (2) "review and identify potential grower and retail customers"; (3) "develop and market new products"; (4) "attend sales calls"; (5) "provide product demonstrations and presentations"; (6)" arrange cutting shipments"; (7) "develop programs for future Westhoff customers"; (8) "evaluate trial products"; (9) "produce advertisements for placement in trade magazines and the like"; and (10) "create [a] publicly accessible[,] English-based North American website, Facebook account/page, and other social media accounts where Westhoff could market and sell[] its products and generate consumer goodwill."  (Defs.' ACC ¶ 11; SAC ¶ 93.)

---

[3] These facts principally are taken from Defendants' Amended Counterclaim.

Defendants and Westhoff agree the Contract conferred BlueSkye with wide discretionary latitude to perform its contractual obligations.  (Defs.' ACC ¶ 12; SAC ¶ 92.) "Westhoff entrusted [BlueSkye] with exclusive access to its North American accounts, and to make broad discretionary business decisions[,] including budgeting, investment strategies, allocation of marketing resources, and strategic partnership on behalf of Westhoff in North America."  (Defs.' ACC ¶ 12 (quoting SAC ¶ 92) (alterations added); *see id.* ¶ 11 (alleging BlueSkye essentially served as "Westhoff's *de facto* Chief Operating Officer" ("COO") for its North American business operations (quoting SAC ¶ 93)).)

Defendants allege "Westhoff did not ask BlueSkye to create photographs as part of its marketing services, or otherwise."  (Defs.' ACC ¶ 13.)  Had Westhoff done so, Defendants allege it would have cost Westhoff "between $1,500 and $2,500 per day . . . and $300 to $3,000 per photograph," in addition to the Contract price.  (*Id.* ¶ 17.)  And, according to Defendants, it was neither "necessary [n]or required" for BlueSkye to take photographs of Westhoff's varietals in order to create marketing materials pursuant to the Contract.  (*Id.*)  Westhoff allegedly "expected BlueSkye to use Westhoff's own photographs to perform [its marketing] services," which BlueSkye did.  (*Id.* ¶ 13.)  But Berg felt that "Westhoff['s] photographs did not meet BlueSkye['s] standards," and he "believed he could create photographs of a higher quality than Westhoff's."  (Defs.' ACC ¶ 14.)  So, during each year of the Contract, Berg took hundreds of photographs of Westhoff's floral varietals ("Photographs") (Defs.' ACC ¶¶ 14–15, 20); the Photographs are annexed as Exhibit H to the Amended Countercomplaint (ECF No. 13-9).

Using those Photographs, BlueSkye created "Variety Catalog[s]" in 2017 and 2018, respectively ("Catalogs" and, together with the Photographs, the "Works").  (*See* Defs.' ACC ¶¶ 20, 32.)  Paragraph 32 provides links to both Catalogs.  (*Id.* ¶ 32.)  Moreover, BlueSkye published the Photographs to a website that it created, maintained, and controlled, called "Westflowers.us" (the "Website").  (Defs.' ACC ¶ 16.)  Defendants aver that only Berg possessed credentials to modify the Website and access the Photographs stored there.  (*Id.*)  The Amended Countercomplaint contains contradictory allegations

concerning BlueSkye's use of the Works.  On the one hand, some allegations suggest the Photographs were used to market *BlueSkye's* business, and not Westhoff's.  (*Id.* ¶ 14 ("BlueSkye used [] Berg's photographs, as work made for hire by a BlueSkye employee, to keep with BlueSkye's standards and reputation in the industry, and in the marketing of its *own* marketing services as it serves many clients, not just Westhoff."); *id.* ¶ 15 ("BlueSkye created marketing materials (that incorporated Mr. Berg's photographs) that BlueSkye itself, not Westhoff, used and distributed through its marketing including, for example only and without limitation, in BlueSkye power point presentations, trade show banners, displays, ads online and in print, and sell sheets.").)  On the other hand, Defendants imply in some places and flatly admit in others that BlueSkye used the Photographs to market *Westhoff* products.  (*See id.* ¶ 15 ("BlueSkye . . . decided how and when BlueSkye used [] Berg's photographs, in lieu of Westhoff photographs."); *id.* ¶ 16 (alleging BlueSkye stored Photographs on a Website, the name of which is a portmanteau of Westhoff); *id.* ¶ 32 (alleging Photographs are used in Westhoff's Catalogs).)

Towards the end of the parties' business relationship in 2018, Christian Westhoff asked Berg to transfer the Website to a German domain hosted by Westhoff's friend in order to save costs.  (Defs.' ACC ¶ 16 (averring Christian Westhoff requested the Website be moved to "Westflowers.de").)  Berg complied.  (*Id.*)  But after the transfer, Berg no longer could access the Website using his credentials.  (*See id.*)  In essence, Defendants allege that Westhoff tricked them into handing over control to the Website and delivering the Photographs.  (*Id.*)

BlueSkye terminated its business relationship with Westhoff in October 2018. (Defs.' ACC ¶ 23 ("Westhoff often fell behind on payments, among other problems.").) Since then, "Westhoff has . . . used each BlueSkye [P]hotograph and its two [C]atologs as its own online and otherwise in marketing materials without BlueSkye's authorization and without payment to BlueSkye." (*Id.* ¶ 25.)  As to the Photographs, Defendants aver that Westhoff continues to use the Photographs on the Website, which it now controls, to advertise its floral varietals. (*Id.* ¶¶ 26–27.)  Westhoff makes those Photographs available

- 6 -

for download to wholesale purchasers for their own marketing purposes.  (*Id.* ¶ 31 (alleging Westhoff "allows its varietal licensees to download" from the Website "BlueSkye's [P]hotographs to use to [advertise] and sell Westhoff flowers").)  Furthermore, Defendants allege "Westhoff has . . . copied and continues to copy" the Catalogs, "which Westhoff offers to the public on [its Website] and in print."  (*Id.* ¶ 32.)

In September 2021, BlueSkye registered copyrights for the Works ("Copyrights").  (Defs.' ACC ¶ 20.)[4]  BlueSkye did not license or assign its copyrights to Westhoff.  (*Id.* ¶ 24.)

### B.    Procedural History

While this case was pending in San Diego Superior Court, Defendants filed their Initial Counterclaim on May 11, 2022.  (Defs.' Initial CC ("ICC"), ECF No. 1-4.)  The Initial Counterclaim asserts three claims:  (1) direct infringement of the Copyrights under the Copyright Act; (2) indirect infringement—vicarious and contributory—of the Copyrights under the Copyright Act; and (3) unfair business practices in violation of California Business and Professions Code § 17200, premised upon the same allegations of infringement and defamation.  On June 24, 2022, Defendants removed the action to this Court pursuant to 28 U.S.C. § 1338.  (Not. of Removal ("Not.") ¶ 2, ECF No. 1.)  Westhoff moved under Rule 12(b)(6) to dismiss Defendants' Initial Counterclaim on July 11, 2022, arguing Defendants failed to state a single cognizable claim.  (ECF No. 7.)

---

[4] The registrations, which are annexed as Exhibits A through G to the Amended Counterclaim, are as follows:

| Title of Work | Registration Number | Registration Date |
| --- | --- | --- |
| 2014 Variety Photos | VA0002267723 | September 2, 2021 |
| 2015 Variety Photos | VA0002267721 | September 2, 2021 |
| 2016 Variety Photos | VA0002267720 | September 2, 2021 |
| 2017 Variety Photos | VA0002267631 | September 2, 2021 |
| 2018 Variety Photos | VA0002267722 | September 2, 2021 |
| 2017–2018 Variety Catalog | TX0009007447 | September 2, 2021 |
| 2018–2019 Variety Catalog | TX0009007448 | September 2, 2021 |

22cv0938

In response, Defendants filed their Amended Counterclaim.  (*See generally* Defs.' ACC.)  The amendments mainly provide additional detail about the scope of the Contract, how the Photographs were created, how BlueSkye used those Photographs, and what Defendants' expectations were concerning Westhoff's rights respecting the Photographs. (*See id.*)  The claims asserted in the Amended Counterclaim are identical to the prior iteration of that pleading.  (*See id.* ¶¶ 37–56.)

On October 18, 2022, Westhoff filed its Answer to Defendants' Amended Counterclaim.  (*See generally* Ans., ECF No. 20.)  That same day, Westhoff also filed a Counterclaim of its own.  (*See generally* Pl.'s CC.)  Counts Two through Eight seek declaratory judgments invalidating Defendants' "counterclaims for copyright infringement against Westhoff under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*" (*See id.* ¶¶ 43, 49, 55, 61, 67, 73, 79.)  These Counts rely on Westhoff's assertion that Defendants purportedly forged the Copyrights' certificates of registration that were annexed to the Initial Counterclaim.[5]  (*See id.* ¶ 21 ("Importantly, the counterclaims filed by Defendants include forged copyright registration certificates, which constitutes intentional fraudulent misrepresentations to the court regarding the ownership of the copyrights since they were not '[t]rue and correct copies.'" (citing Defs.' ICC ¶ 16)).)  To demonstrate the purported forgery, Westhoff compares the certificates annexed to Defendants' Initial Counterclaim with those attached to their Amended Counterclaim, and notes several differences.  (*See id.* ¶¶ 22–30 (comparing each of the seven certificates of registration).)  Westhoff asserts that Defendants' alleged forgery bars them from pressing infringement claims as to each of the seven Copyrights under the "inequitable conduct and unclean hands doctrine[s]."  (*Id.* ¶¶ 42–83.)

---

[5] Count One of Westhoff's Counterclaim asserts copyright infringement with respect to another set of pictures.  In essence, Westhoff alleges Defendants use copyrighted photographs, which belong to Westhoff and depict Westhoff's flowers, in marketing endeavors for competing flower companies.  (*See* Pl.'s CC ¶¶ 31–41.)

The parties have submitted competing motions to dispose of the respective Countercomplaints.  First, Defendants move under Rule 12(b)(6) to dismiss Counts Two through Eight of Westhoff's Counterclaim.  (*See generally* Defs.' Mot.)  They argue Westhoff cannot state claims for either inequitable conduct or unclean hands because BlueSkye owns the registrations for the Copyrights at issue; the certificates annexed to Defendants' Initial Counterclaim were corrupted, not forged; and Defendants remediated the error by attaching accurate certificates to their Amended Counterclaim.  (*See generally* Mem. in Supp. of Defs.' Mot.)  Westhoff opposes (Opp'n to Defs.' Mot., ECF No. 25), Defendants reply (Reply to Defs.' Mot., ECF No. 26), and Westhoff moves to file a sur-reply (Mot. for Leave to File Sur-reply, ECF No. 27).

Second, Westhoff moves under Rule 12(c) for judgment on the pleadings to dismiss Defendants' Amended Counterclaim for failure to state a claim.  (*See generally* Pl.'s Mot.)  Westhoff argues that it has an unlimited and irrevocable implied license to use the Works for marketing purposes.  Because Westhoff's use of the Works following BlueSkye's termination comports with that implied license, Defendants' counterclaims for which infringement is the lynchpin all fail.  (*See generally* Mem. in Supp. of Pl.'s Mot.)  Westhoff further contends that Defendants' Amended Counterclaim is bereft of allegations to support a defamation claim.  (*Id.*)  Defendants oppose (Opp'n to Pl.'s Mot., ECF No. 30) and Westhoff replies (Reply to Pl.'s Mot., ECF No. 32).[6]

---

[6] Defendants filed their Opposition one day late. (Reply to Rule 12(c) Mot. at 1 n.1.)  However, the Court construes the portion of Defendants' opposition that seeks to explain the delinquency as a motion to extend under Rule 6(b).  (*See* Opp'n to Pl.'s Mem. at 6 n.1.)  Upon consideration of the relevant four-factor test, the Court finds Defendants' proffered explanation for the delay amounts to excusable neglect under Rule 6(b).  *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) (enumerating four-factor equitable test for determining excusable neglect under Rule 6(b), and opining that "[Rule 6(b)], like all the Federal Rules of Civil Procedure, is to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits"); *Jones v. Cnty. of San Diego*, No. 20CV1989-GPC(DEB), 2022 WL 126115, at *1 (S.D. Cal. Jan. 13, 2022) ("[Rule] 6(b) permits a court, at its discretion, to accept a late filing when the movant's failure to meet the deadline was the result of excusable neglect."); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993) ("[I]t is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant.").  Hence, the Court declines Westhoff's invitation to ignore the Opposition.

Finally, Defendants move to strike Counts Two through Eight of Westhoff's Countercomplaint and their supporting allegations under California's Anti-SLAPP law. (*See generally* Mem. in Supp. of Anti-SLAPP Mot.)  Westhoff opposes (Opp'n to Anti-SLAPP Mot., ECF No. 34) and Defendants reply (Reply to Anti-SLAPP Mot., ECF No. 35).

## II.    ANALYSIS

### A.    The Court Converts Westhoff's Rule 12(c) Motion to a Rule 12(b)(6) Motion

Resolution of Westhoff's Motion first serves this Court's and the parties' interest in efficiency.  If Defendants' counterclaims of infringement counterclaims fall, Westhoff's mirror-image declaratory judgment counterclaims are moot.  *See, e.g.*, *E-Tool Dev., Inc. v. Maxim Integrated Prods., Inc.*, No. 3:17-CV-0720-PK, 2018 WL 2208428, at *1 (D. Or. May 14, 2018).  Thus, despite being the second-filed Motion, it only makes sense to address Westhoff's Motion first.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

However, Defendants seek to cut Westhoff off at its knees as a matter of procedure on the ground that Westhoff prematurely moved for judgment on the pleadings pursuant to Rule 12(c).  (Opp'n to Pl.'s Mot. at 16:4–17:2.)  They are correct.

Rule 12(c) provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Pleadings are considered closed when all the required or permitted pleadings under Rule 7(a) have been served and filed.  *Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005).  Rule 7(a) lists seven permissible pleadings:  (1) a complaint, (2) an answer to a complaint, (3) an answer to a counterclaim designated as a counterclaim, (4) an answer to a crossclaim, (5) a third-party complaint, (6) an answer to a third-party complaint, and (7) if the court orders one, a reply to an answer.  Fed. R. Civ. P. 7(a)(1)–(7).  A motion to dismiss is not considered a "pleading" within the meaning of Rule 7(a).  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 788 (9th Cir. 2000), *overruled in part on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2022); *see Walter v. Drayson*,

22cv0938

Civ. No. 06-0568 SOM/KSC, 2007 WL 951539, at *1 (D. Haw. Mar. 27, 2007) (collecting authorities); *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 581 (S.D.N.Y. 2011) (citing Rule 7(a); collecting authorities).

Defendants have not filed an "answer" to Westhoff's Counterclaim. They have filed only a motion to dismiss. Hence, the pleadings in this case are not yet "closed," and it was procedurally improper for Westhoff to bring its Motion under Rule 12(c). *See Tahoe-Sierra Pres. Council*, 216 F.3d at 788 (holding that a motion to dismiss is not a pleading under Rule 7(a)).

However, this determination does not spell the end for Westhoff's efforts to dispose of Defendants' Amended Counterclaim on the pleadings. "District courts have broad discretion and the 'inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.'" *Dean v. Colgate Palmolive Co.*, 772 F. App'x 561 (Mem.) (9th Cir. 2019) (quoting *Dietz v. Bouldin*, 578 U.S. 40, 47 (2016))[7]; *Landis*, 299 U.S. at 254 (opining that "every court" wields "inherent" power "to control disposition of the cases on its docket with the economy of time and effort for itself, for counsel, and for litigants"). Incidental to that "inherent authority" is the district courts' power to convert a motion for judgment on the pleadings under Rule 12(c) into a motion to dismiss under Rule 12(b)(6). *See Terlato Wine Grp., Ltd. v. Walsh*, No. 06 C 2521, 2006 WL 2494794, at *2 (N.D. Ill. Aug. 24, 2006) ("Although the rule is that a party may move for a Rule 12(c) judgment after the pleadings have closed (i.e. the parties have filed the complaint and answer), *Murray Household Bank (SB), N.A.*, 386 F. Supp. 2d 993, 995 (N.D. Ill. 2005), the court may convert a Rule 12(c) motion into a Rule 12(b)(6) motion to dismiss where the 12(c) motion is filed prematurely. *U.S. ex rel. Bidani v. Lewis*, No. 97 C 6502, 2001 WL 1609377, at *4 (N.D. Ill. Dec. 14, 2001)."); *Geltman v. Verity*, 716 F. Supp. 491, 492 (D. Colo. 1989) ("[A] motion for judgment on the pleadings filed before the answer may be treated as a motion to dismiss." (citation omitted)).

---

[7] Citation to this unpublished Ninth Circuit opinion is appropriate under Ninth Circuit Rule 36-3(b).

Efficient and expedient resolution of this case is served by conversion. Whether Westhoff's motion is channeled through Rule 12(c) or Rule 12(b)(6), the same standard governs. *See, e.g.*, *Landmark Am. Ins. Co. v. Navigators Ins. Co.*, 354 F. Supp. 3d 1078, 1081 (N.D. Cal. 2018) (observing a Rule 12(c) motion for failure to state a claim "faces the same test as a motion under Rule 12(b)(6)). Hence, the legal issues that the parties raise and that the Court must address in connection with Westhoff's Motion are unchanged by conversion. And as previously mentioned, it would be most efficient for this Court to resolve Defendants' counterclaims of infringement *before* Westhoff's counterclaims seeking declaratory judgments finding non-infringement of the same Copyrights. *See, e.g.*, *E-Tool Dev.*, 2018 WL 2208428, at *1 ("Plaintiff's claims of patent infringement are dismissed with prejudice, and Defendant's counterclaim for declaratory judgment that its EE-Sim Tool does not infringe upon the Patent is dismissed as moot."); *Pom Wonderful LLC v. Hubbard*, No. CV 13-6917 RGK (JPRx), 2016 WL 5920103, at *2 (C.D. Cal. June 29, 2016) ("The first counterclaim (declaratory judgment of non-infringement) is now moot because this Court ruled that Pur has infringed Pom Wonderful's 'POM' mark.").

Finally, given that Westhoff's motion has been pending since March 2023 and that this Court has a preference to resolve motions on the merits, the Court finds that it is warranted to convert Westhoff's Motion and consider it, despite its procedural impropriety. *Cf. Henneberry v. City of Newark*, No. 13-cv-5238-TSH, 2018 WL 5310791, at *1 (N.D. Cal. Oct. 25, 2018) ("While Plaintiff's motion is untimely, the parties' motions in limine have been pending for over six months and Defendants were able to file their opposition after the deadline. As the motion has been fully briefed and the Court's preference is to resolve motions on the merits, the Court will consider Plaintiff's motion.").[8] Thus, it would

---

[8] This Court is unmoved by Defendants' argument that the converted Motion is untimely under Rule 12(b). (*See* Defs.' Opp'n at 16 n.3.) As numerous federal district courts in California have held, Rule 12(h)(2) creates an exception that permits "defenses [under Rule 12(b)(6)] for failure to state a claim [to] be presented at any time up to and including trial." *Wilson-Combs v. Cal. Dep't of Consumer Affairs*, 555 F. Supp. 2d 110, 1113 n.3 (E.D. Cal. 2008); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 09-CV-2487-DMG (PLAx), 2013 WL 12203024, at *4 (C.D. Cal. Apr. 4, 2013).

run counter to the orderly and coherent resolution of the instant case to deny Westhoff's motion on purely procedural grounds.

Accordingly, the Court **CONVERTS** Westhoff's Motion to one brought under Rule 12(b)(6).

### B.   Westhoff Prevails on its Motion to Dismiss Defendants' Amended Countercomplaint for Failure to State a Claim

Defendants' Amended Countercomplaint lodges three counterclaims against Westhoff.  The first two assert direct and indirect infringement of the Copyrights under the Copyright Act,  17 U.S.C. § 101 *et seq*.  (*See* Defs.' ACC ¶¶ 37–51.)  The third asserts unfair business practices, in violation of California Business and Professions Code § 17200.  (*Id.* ¶¶ 52–56.)  That claim is premised upon not only Westhoff's alleged infringement, but also upon Defendants' averment that Westhoff's CEO defamed them. (*See id.* ¶ 54.)  For the reasons stated below, Defendants fail to plausibly state any one of these claims.

### 1.   Legal Standard

Rule 12(b)(6) tests the legal sufficiency of the allegations underlying the claims in a complaint.  *See Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  The procedural posture at Rule 12(b)(6) requires the court to accept all factual allegations pleaded in the complaint as true and to construe those allegations, and draw all reasonable inferences therefrom, in favor of the plaintiff.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).  A Rule 12(b)(6) dismissal may be based on either a 'lack of cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

To avoid Rule 12(b)(6) dismissal, a complaint must plead sufficient factual allegations to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008) (internal quotation marks and citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.* at 678–79. "Determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 680 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint." *ASARCO, LLC v. Union Pacific R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014); *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("[T]he assertion of an affirmative defense may be considered properly on a motion to dismiss where the 'allegations in the complaint suffice to establish' the defense." (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)); *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO*, 765 F.3d at 1004 (citing *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam)). But, if "the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense"—then dismissal at the pleading stage on the basis of an affirmative defense rests on solid ground. *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022).

### 2. Defendants' Counterclaims Based Upon Copyright Infringement Fail as a Matter of Law

Westhoff contends that the counterclaims for which infringement of the Copyrights is the lynchpin all fail because Defendants granted Westhoff an unlimited and irrevocable implied license to use the Works to market, advertise, and sell its flowers. (Mem. in Supp. Pl.'s Mot. at 4:27–5:2.) Defendants contend that Westhoff holds no such implied license.

(Opp'n to Pl.'s Mot. at 16:5–23:15.)  Alternatively, Defendants claim that even if Westhoff holds an implied license, it has since been revoked.  (*Id.* at 23:17–24:18.)

Implied license is an affirmative defense to both direct and indirect copyright infringement.  *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) (direct infringement); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1025–26 (9th Cir. 2001) (indirect infringement); *see also Rescue v. Walters*, No. C20-5700JLR, 2021 WL 22591, at *4 (W.D. Wash. Jan. 4, 2021) (observing that a license to use copyrighted work need not be in writing to be valid—it may be granted orally or inferred through the parties' conduct and the circumstances surrounding the transaction at issue).[9]  The party who raises an implied license to evade infringement liability bears the burden of establishing the affirmative defense's existence.  *Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 968 (C.D. Cal. 2019).

The question whether an implied license exists is to be "determined by the licensor's objective intent at the time of the creation and delivery of the copyrighted work as manifested by the parties' conduct."  *Signorelli v. N. Coast Brewing Co., Inc.*, No. 5:18-cv-2914-EJD, 2019 WL 2569582, at *3 (N.D. Cal. June 21, 2019) (citing *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008)).  To decipher the putative licensor's "objective intent," district courts in the Ninth Circuit apply a three-factor test, which *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990), delineates (the "*Effects* test").  Under the *Effects* test, an implied license exists when "(1) a person (the licensee) requests the creation of the work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the  licensor intends that the licensee-requestor copy and distribute his work."  *Gagnon*, 542 F.3d at 754–55  (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)).  Importantly, "[t]he last prong of the *Effects* test . . . is not limited to copying and distribution"; district courts are to ascertain the intent

---

[9] Oral and implied licenses can be nonexclusive only.  *See Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 929 (9th Cir. 1999).  Westhoff does not contend it holds an exclusive license.

of the putative licensor respecting all the "protected right[s] at issue." *Id.* at 755. Here, that includes Westhoff's retention, use, and modification of the Works. *See id.*

### a. Defendants Granted Westhoff an Unlimited Implied License

Application of the *Effects* test to Defendants' infringement allegations reveals that Defendants, indeed, have pleaded themselves out of court. *See, e.g.*, *Boquist*, 32 F.4th at 774. Even when construed in a light most favorable to Defendants, their averments plausibly illustrate Defendants' objective intent to grant Westhoff permission to retain, use, and distribute the Works in its marketing endeavors, notwithstanding Defendants' continued involvement as Westhoff's independent contractor.

### i. Did Westhoff Request the Works?

The first prong of the *Effects* test inquires whether the putative licensee requested creation of the copyrighted works. *See Gagnon*, 542 F.3d at 754–55. The parties appear united in the analytical framework that they contend governs this question. They both essentially assert that it can be said that Westhoff "requested" the Works only if the Contract covered production of those Works. (*See* Mem. in Supp. of Pl.'s Mot. at 6:21–7:20; Opp'n to Pl.'s Mot. at 18:15–20.) The Court agrees this is an appropriate starting point to assess the first *Effects* factor. *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001) (noting that contract can be evidence of a relationship giving rise to implied copyright license); *Shaver*, 74 F.3d at 776 (analyzing "the language of the contract itself" and "the scope of the work" performed thereunder to determine intent); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (determining intent from unsigned contract); *accord N.A.D.A. Servs. Corp. v. Bus. Data of Va., Inc.*, 651 F. Supp. 44, 49 (E.D. Va. 1986) ("The creation of an implied license, as in the creation of any implied contract, requires a meeting of the minds.").

From there, the parties diverge. Defendants contend that because the Contract did not explicitly cover photography services, the Contract excludes the Works. (*See* Opp'n to Pl.'s Mot. at 18:12–19.) That is, while the Contract delineates several discrete tasks

BlueSkye was paid to perform to market, advertise, and sell Westhoff's flowers, "photography" is not one of them. (*Id.*) Rather, Defendants aver Berg took the Photographs "on [his] own initiative." (*Id.* at 10:8 (citing Defs.' ACC ¶ 14).) Conversely, Westhoff avers that the Amended Countercomplaint itself "pleads that Defendants created [the Photographs] for Westhoff pursuant to the services Westhoff hired BlueSkye to perform." (Reply in Supp. of Pl.'s Mot. at 3:18–24.) The Contract called for BlueSkye to "develop and market new products," "produce advertisements," and create a website. (*See* Defs.' ACC ¶ 11 (citing SAC ¶ 93).) Westhoff's line of business is selling flowers. Westhoff asserts that "[f]lowers are ornamental aesthetic products and customers need to *see* what they are buying, so photographic representations are instrumental in the flower industry." (*See* Mem. in Supp. of Pl.'s Mot. at 7:5–12; *see also id.* at 10:14–16 ("Defendants' own work creating Westhoff's website required including photographs of Westhoff's flower products so that Westhoff's customers can see the flower products they are buying from Westhoff since flowers are aesthetic centerpieces.").) Hence, Defendants' creation of the Photographs and marketing materials featuring those Photographs in marketing materials, *e.g.*, the Catalogs and the Website, fall squarely within Defendants' services delineated in the Contract.

Courts typically apply the *Effects* test flexibly, allowing the parties' objective intent to lead the way. *See John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003) ("The touchstone for finding an implied license to use copyrighted [work] is intent."); *see also* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A][7] at 10-55 (2013) (admonishing against inflexible application of *Effects* test). Defendants' rigid focus upon the absence of an explicit request from Westhoff to create the specific Works is incongruent with this principle. Moreover, Defendants' proposed approach contravenes the Ninth Circuit's decision in *Falcon Enterprises, Inc. v. Publishers Service, Inc.*, 438 F. App'x 579 (9th Cir. 2011).[10] In that case, the defendant publisher

---

[10] Citation to this unpublished Ninth Circuit opinion is appropriate under Ninth Circuit Rule 36-3(b).

received and routinely published images created and delivered by the plaintiff licensee over a four-year period. *Id.* at 581. It was undisputed in *Falcon* that the defendant had never explicitly requested the specific images. *Id.* Nevertheless, the *Falcon* court held the absence of an express request did not impede satisfaction of the first *Effects* test prong, for the parties' conduct filled that void. *Id.* ("Although Falcon did not produce its content at Publishers' specific request, . . . for years Falcon sent images to satisfy Publishers' ongoing demand for content and Publishers regularly published the content that Falcon supplied.").

Westhoff's argument rings truest to the general principles governing implied licensure and Ninth Circuit precedent. The Contract, the parties' conduct, and common sense all illustrate that Westhoff "requested" the Works for the purpose of the *Effects* test.

Defendants allege that Westhoff paid BlueSkye $8,000 monthly—and covered business-related expenses—for it to, *inter alia*, "develop and market new products," "produce advertisements for placement in trade magazines and the like," and "create [a] publicly accessible[,] English-based North American website, Facebook account/page, and other social media accounts where Westhoff could market and sell[] its products and generate consumer goodwill." (*Id.* ¶ 11 (quoting SAC ¶ 93).) The Contract is silent as to whether BlueSkye's services included photographs of Westhoff's flowers to use in the marketing materials it was engaged to create. But the Contract's broad delegation of practically *all* Westhoff's marketing, advertising, and sales functions in North America to BlueSkye leads only to the plausible inference that BlueSkye had discretion to do what it needed—within the bounds of reason—to create marketing materials worthy of the consideration paid for them. (*See id.* ¶¶ 11–13.) This includes taking Photographs of the very products Westhoff retained BlueSkye to advertise, and incorporating those Photographs in the marketing materials Westhoff paid BlueSkye to create.

Furthermore, as in *Falcon*, the parties' conduct—as alleged in the Amended Countercomplaint—supports a finding that Westhoff satisfied the first prong of the *Effects* test. *See* 438 F. App'x at 581. Defendants allege that Berg took Photographs of Westhoff's line of flowers each year of the parties' four-year business relationship. (Defs.' ACC ¶ 20

(alleging Berg took "Variety Photos" in 2014, 2015, 2016, 2017, and 2018).)   And Defendants allege that they published those Photographs to the Website and used them to create two Catalogs—both the Website and Catalogs being explicit marketing deliverables under the terms of the Contract.  Defendants do not allege that they ever informed Westhoff that the Photographs were not included within BlueSkye's services under the Contract. Nor do Defendants allege that they ever sought additional payment from Westhoff for the Photographs beyond the amount they were paid and reimbursed each month.  Thus, the parties' conduct suggests that the Works were produced in response to a request.

Finally, Defendants' conclusory allegation Berg created the Photographs on his "own initiative" requires the suspension of common sense.  Berg did not take photographs of flowers and *then* solicit Westhoff to market on its behalf through BlueSkye.  *Cf. Taylor Holland LLC v. MVMT Watches, Inc.*, No. 2:15-CV-3578-SVW-JC, 2016 WL 6892097, at *5 (C.D. Cal. Aug. 11, 2016).  The Photographs were taken *after* Westhoff retained his Company, BlueSkye, to advertise the very flowers featured in the Works.  Indeed, the only reasonable inference permitted by Defendants' allegations is that Berg had access to Westhoff's flowers *because* he had been engaged by Westhoff to market them.  Defendants do not allege Berg bought the Westhoff flowers he photographed or that Berg asked permission to take the Photographs in connection with his own artistic endeavors.  Rather, Defendants aver Berg created the Photographs while he was performing services under the Contract as BlueSkye's president and employee.  And while Defendants make much to do about the artistic freedom Berg allegedly retained in choosing when, where, and how to photograph Westhoff's products (*see* Defs.' ACC ¶¶ 13, 15), that speaks to the wide discretion Defendants allegedly possessed to create and stylize Westhoff's marketing materials.  It does not support the assertion that the Photographs somehow are divorced from the marketing services Defendants promised to perform as part of the Contract (*Id.* ¶¶ 13–14).

## ii.    Did Defendants Deliver the Works?

The second prong of the *Effects* test asks whether the putative licensor "delivered" to the putative licensee the works at issue.  *See Gagnon*, 542 F.3d at 754–55.

Photographs:   Defendants aver that "BlueSkye did not deliver [the] [P]hotographs to Westhoff."  (Defs.' ACC ¶ 15.)  Rather, Defendants assert that Westhoff attained the Photographs through trickery.  (Opp'n to Pl.'s Mot. at 20:21–23:1.)   Upon closer examination, Defendants' allegations respecting the Photographs do not support the story they attempt to tell in their Opposition.

Defendants allege that one of BlueSkye's discrete obligations under the Contract was to create a "publicly accessible . . . North American website . . . where Westhoff could market and sell[] its products and generate consumer goodwill."  (Defs.' ACC ¶ 11.)  After entering the Contract, and while BlueSkye served as Westhoff's principal marketer in North America, Defendants created the Website.  (*Id.* ¶ 16.)  The Website housed the Photographs of Westhoff's flowers and the Website's name—Westflowers.com—was a portmanteau of the Westhoff brand, facts the Court finds significant.  (*Id.*)  Nevertheless, Defendants appear to allege that the Website was part of BlueSkye's *own* marketing endeavor, and not connected with its marketing services for Westhoff.  (*See id.* ¶ 14; *but see id.* ¶¶ 15, 32.)  Yet, when requested by Christian Westhoff to hand over credentials to the Website so that it could be transferred to a German domain, where it would be stored at cheaper cost, Defendants did not balk.  They dutifully obliged, and gave Westhoff access to the Website and the Photographs stored thereon.  (*Id.*)

Based on these averments, the assertion that Defendants did not deliver the Photographs but were instead duped into providing Westhoff with access does not add up.  Why would Defendants honor a request to hand over the credentials of their own Website, purportedly having nothing to do with the services provided to Westhoff under the Contract?  And why would Westhoff bear the costs of upkeeping the Website's domain—or have an interest in pursuing cheaper domain options—if the Website was not developed to serve Westhoff but instead pertained purely to BlueSkye's own marketing endeavors?

The Amended Countercomplaint contains no explanations for these critical questions. Even when read in a light most favorable to Defendants, the Amended Countercomplaint's allegations support only one reasonable inference:  Defendants transferred the Website to Westhoff because it was one of the deliverables that BlueSkye had explicitly promised Westhoff under the Contract and, therefore, had no basis to deny Westhoff's CEO's request.  And when Defendants did that, they also delivered the Photographs of Westhoff's flowers.

Catalogs:  Unlike the Photographs, Defendants do not allege that Westhoff obtained the Catalogs from the Website.  Indeed, they do not specifically allege *how* Westhoff obtained the Catalogs in 2017 and 2018, but they acknowledge in their Amended Countercomplaint that Westhoff did, indeed, possess them prior to termination.  (*See* Defs.' ACC ¶¶ 32, 34.)  Therefore, on the face of the pleading, the only plausible explanation for how Westhoff obtained the Catalogs is that Defendants delivered them.

### iii.   Did Defendants' Conduct Objectively Manifest an Intent to Grant an Implied License?

At the third and final prong of the *Effects* test, this Court must probe whether Defendants' conduct manifested their intent to grant Westhoff an implied license to retain, use, and distribute BlueSkye's Works.  *See Gagnon*, 542 F.3d at 754–55.  Westhoff, therefore, must demonstrate that the Amended Countercomplaint's allegations indicate that Defendants "create[d] [the Works] with knowledge and intention that [they] will be used by [Westhoff]" to market, advertise, and sell its flowers.  *See Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1111 (C.D. Cal. 2010).

The Ninth Circuit instructs district courts to "focus primarily" on the putative licensor's "objective intent at the time of the creation and delivery [of the work]."  *Corbello v. DeVito*, 777 F.3d 1058, 1067 (9th Cir. 2015) (quoting *Gagnon*, 542 F.3d at 756).  To guide courts in this inquiry, the Ninth Circuit delineated three considerations in *Gagnon*: (a) the length of the parties' relationship; (b) the existence of written restrictions on the use of the works; and (c) the putative licensor's conduct at the time of delivery (the "*Gagnon*"

- 21 -

factors).  542 F.3d at 755; *see also Everett v. MX Elecs. Mfg.*, *Inc.*, No. 8:22-cv-0802-JVS (ADSx), 2022 WL 17078203, at *3 (C.D. Cal. Sept. 14, 2022).

<u>Length of Relationship</u>:  The first *Gagnon* factors focuses on the length of the parties' relationship and nature of the transaction.  "[A] short-term, discrete transaction indicates that the parties only intended the creator's work to be a discrete contribution and that others could use the work in future products."  *Taylor Holland*, 2016 WL 6892097, at *6 (citing *Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d 1192, 1200 (S.D. Cal. 2014)). By contrast, a long-term relationship suggests that the parties contemplated the licensor would continue to be involved in future projects and, therefore, militates against finding an implied license.  *Id.* (citing *Fontana v. Harra*, No. CV 12-10708 CAS (JCGx), 2013 WL 990014, at *6 (C.D. Cal. Mar. 12, 2013)).

At first blush, this factor appears to weigh against an implied license.  Defendants provided marketing, advertising, and sales services to Westhoff for approximately four years.  (Defs.' ACC ¶¶ 10, 23.)  And the tasks Defendants performed were far from discrete:  BlueSkye effectively served as "Westhoff's *de facto* [COO] of its North American business operations," (*id.* ¶ 12 (quoting SAC ¶ 93).)

But the *Gagnon* factors should not be applied rigidly.  They are elastic enough to leave room for those instances where the normative assumptions that underpin the *Gagnon* factors do not adequately explain the putative licensor's objective intent as manifested by the Contract and its conduct.  *Cf. Gagnon*, 542 F.3d at 756 ("The [long-term] relationship of the parties indicates neither an intent to grant nor deny a license without Gagnon's future involvement."); *Fontana*, 2013 WL 990014, at *8 ("[T]he three factor test does not fit this case, and as in [*Gagnon*, 542 F.3d at 756], the alleged ongoing relationship between the parties, by itself, is not probative of their intent.").  Indeed, "[i]n some cases, an ongoing relationship between the parties is not probative of their intent." *Taylor Holland*, 2016 WL 6892097, at *6 n.14 (collecting authorities).  This is one of those cases.

Here, as in *Gagnon*, "every objective fact concerning the transaction" besides the length of Westhoff and BlueSkye's relationship supports the finding of an implied license.

22cv0938

542 F.3d at 756 (quoting *Effects*, 908 F.2d at 559 n.6).   Westhoff retained BlueSkye to provide a broad spectrum of marketing, advertising, and sales-related services, and conferred BlueSkye with wide discretion and ultimate decision-making authority in the provision of those services.   Each year of the four-year relationship, Berg created Photographs of Westhoff's flowers, which he and his company had been hired to market, and incorporated those Photographs into marketing materials—namely the Website and the Catalogs—that BlueSkye had been explicitly hired to create.   Defendants do not allege that the Contract excludes photography services.   Nor do Defendants allege that they ever informed Westhoff the photography services they had provided year after year was separate from the Contract.   Hence, the ongoing nature of the parties' relationship is not probative of Defendants' intent to limit Westhoff's use of the Works in future marketing endeavors.

<u>Use of Written Contracts</u>:   An implied license cannot override express terms of a written contract. *See, e.g.*, *Oracle Am., Inc. v. Terix Computer Co., Inc.*, No. 5:13-cv-3385-PSG, 2015 WL 2090191, at *8 (N.D. Cal. May 5, 2015); *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1054 (C.D. Cal. 2008).   Defendants correctly concede that the absence of any written agreement between the parties weighs in favor of a finding of implied license.[11]   (Defs.' Opp'n at 22:26–23:1.)

<u>Defendants' Conduct at the Time of Delivery</u>:   The third consideration is whether Defendants' conduct at the time they delivered the work objectively indicates intent to grant a license to Westhoff to use the Works for marketing purposes. *Reinicke*, 38 F. Supp. 3d at 1201.

"Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it."

---

[11] Defendants argue that Count One in Westhoff's Countercomplaint—which asserts claims for copyright infringement as to other copyrighted photographs belonging to Westhoff—"strongly indicates Westhoff and BlueSkye both intended to limit the other's use of their respective photographs."  (Defs.' Opp'n to Pl.'s Mot at 23:2–7.)  It does not.  Westhoff's counterclaims filed approximately four years after Berg created the last Work is not indicative of the parties' "intent at the time of the creation and delivery" of the Works.  *See Corbello*, 777 F.3d at 1067.

*Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006).  The allegations in the Amended Counterclaim indicate that, at the time of delivery, Defendants knew full well that Westhoff used the Works to market its products.  Indeed, BlueSkye, itself, used the works on Westhoff's behalf.  (*See* Defs.' ACC ¶¶ 15, 32.)  Crucially, Defendants do not allege they communicated to Westhoff any limitation on its use of the Works at the time of delivery.  *See Beijing Zhongyi Zhongbiao Elec. Info. Tech. Co. Ltd. v. Microsoft Corp.*, 655 F. App'x 564, 566 (9th Cir. 2016) (affirming district court's dismissal, with prejudice, of plaintiff's claim defendant infringed license by exceeding its scope where pleading did not show "intent to limit the license's scope")[12]; *Castro v. Calicraft Distribs., LLC*, No. 14-CV-5226-RS, 2015 WL 5042225, at *3 (N.D. Cal. Aug. 25, 2015) (dismissing copyright infringement claim on basis of implied license where the complaint contained "no allegations that . . . a limitation was communicated to defendants"); *Signorelli*, 2019 WL 2569582, at *3 ("Having failed to express any intent to limit the implied license, [defendant] received an unlimited implied license to [plaintiff's] work.").  Defendants' silence speaks volumes.  *See Field*, 412 F. Supp. 2d at 1116.

In sum, application of the *Effects* test to Defendants' allegations in their Amended Counterclaim reveals that Defendants' objectively intended to grant Westhoff an unlimited implied license to use BlueSkye's Works in marketing, advertising, and selling Westhoff flowers.

**b.     The Unlimited Implied License is Irrevocable**

An implied license is limited in duration if the licensor revokes it.  *See, e.g.*, *Berster Techs., LLC v. Christmas*, No. S-11-1541 KJM JFM, 2012 WL 33031, at *9 (E.D. Cal. Jan. 6, 2012) (holding that a licensor's filing a copyright infringement action amounts to revocation (citing *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003))).  But not all implied licenses are revocable.  An implied license is revocable only "where no

---

[12] Citation to this unpublished Ninth Circuit opinion is appropriate under Ninth Circuit Rule 36-3(b).

consideration has been given for the license." *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (citing, *inter alia*, *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994)).   However, an implied license that is "accompanied by consideration" is irrevocable. *Gagnon*, 542 F.3d at 758 (collecting authorities); *Reinicke*, 38 F. Supp. 3d at 1203–04 ("If consideration is paid, a license is irrevocable because a nonexclusive license supported by consideration is a contract.  If an implied license accompanied by consideration were revocable at will, the contract would be illusory." (citations omitted)).

Defendants allege that Westhoff paid BlueSkye $8,000 per month for the duration of the Contract and also covered BlueSkye's business-related expenses.  (Defs.' ACC ¶ 12.)  In exchange, BlueSkye promised to perform a variety of marketing services, including but not limited to, creating the Website and producing advertisements for Westhoff flowers, like the Catalogs.  (*Id.*)  Defendants contend, however, that the amount it was compensated does not cover the Photographs, which BlueSkye subsequently incorporated into the Website and Catalogs.  (Opp'n to Pl.'s Mot. at 23:15–24:13.)

The tactic Defendants seek to employ has been tried and rejected before.  Several times, the Ninth Circuit has quashed *post hoc* attempts by creators who claim the compensation they received covered their labor but not the actual works produced.  *See Gagnon*, 542 F.3d at 756–57 ("[I]t defies logic that AMS would have paid Gagnon for his programming services if AMS could not have used the programs without further payment pursuant to a separate licensing agreement that was never mentioned in the TSA, and never otherwise requested at the time."); *Effects*, 908 F.2d at 558–59 ("To hold that Effects did not at the same time [as creating the work at defendant's request and handing it over to defendant] convey a license to use the footage . . . would mean that plaintiff's contribution to the film was of minimal value, a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage."); *see also Yates v. Adams*, No. 15-cv-4912-JD, 2017 WL 783520, at *3 (N.D. Cal. Mar. 1, 2017) (rejecting creator's argument the compensation "he received was only for his labor, and not for the software itself").

Defendants' argument is entitled to this same fate. This Court has already found the Works were incidental to the marketing services and products BlueSkye provided to Westhoff under the Contract.

Accordingly, the Court finds that Westhoff paid Defendants for marketing services that included the Works and, therefore, the implied license granted to Westhoff is an irrevocable one.

### c.  Westhoff's Use and Distribution of the Works Does Not Exceed the Scope of the Implied License

Defendant's own allegations—construed in their favor—indicate that Westhoff possesses an unlimited, irrevocable implied license to use the Works for marketing purposes. None of Westhoff's alleged uses of the Works overstep the scope of implied license it attained. Westhoff uses the Photographs and Catalogs on its Website to market its own products. (*See* Defs.' ACC ¶¶ 26–27; *see also id.* ¶ 32 (alleging Westhoff makes Photographs and Catalogs available in print).) And consistent with the Contract, Westhoff makes the marketing materials containing the Photographs available for download to purchasers of its flowers, to aid and assist those purchasers in their own marketing endeavors. (*Id.* ¶ 31; *see also id.* ¶ 11 (identifying as two of BlueSkye's several obligations: (1) "develop programs for future Westhoff customers" and (2) "create " [a] publicly accessible[,] English-based North American website . . . where Westhoff could market and sell[] its products and generate consumer goodwill").)

Accordingly, the Court **GRANTS** Westhoff's Motion to the extent it seeks dismissal of Defendants' counterclaims under the Copyright Act *and* its state law counterclaim premised upon the same allegations of copyright infringement.

### 3.  Defendants Fail to State a Claim for Defamation

Having dismissed Defendants' counterclaims based on infringement, the Court turns next to the surviving segment of Defendants' lone remaining counterclaim under California Business and Professions Code § 17200 *et seq.* premised upon defamation. (Defs.' ACC ¶ 54 ("Westhoff has defamed BlueSkye and [] Berg and continues to defame BlueSkye and

- 26 -

[] Berg.").)  Under California law, defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage."  *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007).

Defendants allege that Christian Westhoff—Westhoff's CEO—"made knowingly false statements to a board member of a BlueSkye client (and a competitor to Westhoff) that BlueSkye and/or Mr. Berg engaged in fraud to cause Westhoff to pay for personal expenses and other financial misdeeds—knowing these accusations are false—for the express purpose of discouraging the client to work with BlueSkye."  (*Id.* ¶ 36.)  But Defendants' counterclaim is not lodged against Christian Westhoff:  only Westhoff—Christian Westhoff's employer—is a Counterdefendant.

California law is clear that employers are not strictly or automatically liable for the intentional torts of their employees.  *See Farmers Ins. Grp. v. Cnty. of Santa Clara*, 11 Cal. 4th 992, 1004 (1995) ("Notwithstanding the generally broad view given to scope of employment determinations, the law is clear that an employer is not strictly liable for all actions of its employees [and officers] during work hours").  And while California law enunciates several broadly construed principles that permit vicarious liability, *see Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1080 (9th Cir. 2003) (*respondeat superior*); *Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1158 (2019) (ratification), Defendants do not allege which, if any, doctrine they seek to invoke.  Nor do Defendants allege any facts that track with  a cognizable theory that would permit liability for defamation to extend from Westhoff's CEO to Westhoff itself.

Because the Court cannot assume the existence of theories or facts not alleged in the Amended Countercomplaint, Defendants fail to state an unfair business practices counterclaim against Westhoff.  *See Iqbal*, 556 U.S. at 679.  Accordingly, the Court **GRANTS** Westhoff's Motion to the extent it seeks dismissal of Defendants' § 17200 counterclaim based on defamation and **DISMISSES** the Amended Countercomplaint in its entirety.

22cv0938

\*     \*     \*     \*

Having dismissed Defendants' counterclaims, the Court must ascertain whether such dismissal should be with or without prejudice.  The Court dismisses Defendants' counterclaims based on copyright infringement **WITH PREJUDICE**, for further amendments would be futile.  Defendants already had two opportunities to proffer failsafe allegations that would prevent Westhoff from demonstrating the existence of an unlimited and irrevocable implied license.  *See Boquist*, 32 F.4th at 774 (instructing that only if the claimant's own allegations "admit[]all the ingredients of an impenetrable defense" is an affirmative defense a basis for dismissal on the pleadings).  Yet, Defendants still pleaded themselves out of court in their Amended Counterclaim.  *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (in determining whether to allow amendment, the court considers "futility of amendment and whether the party has previously amended his pleadings'); *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980) ("[A] district court has broad discretion to grant or deny leave to amend, particularly where the court has already given plaintiff one or more opportunities to amend his complaint.").

However, dismissal of Defendants' § 17200 counterclaim based on Christian Westhoff's alleged defamation is **WITHOUT PREJUDICE**.  The Court cannot say at this juncture whether amendment would be futile.  Indeed, to correct the deficiencies observed by this Court, Defendants merely must proffer allegations adequate to invoke a cognizable theory of vicarious liability or add Christian Westhoff as a Counterdefendant to this action.

## C.    Counts Two through Eight of Westhoff's Counterclaim are Moot

In response to Defendants' counterclaims alleging that it infringed upon the Copyrights in violation of the Copyright Act, Westhoff asserted seven counterclaims of its own.  Counts Two through Eight of Westhoff's Counterclaim seek declaratory judgments of non-infringement as to each of the Copyrights, which, if granted, would invalidate Defendants' "counterclaims for copyright infringement against Westhoff under

the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*" (*See id.* ¶¶ 43, 49, 55, 61, 67, 73, 79.)

"A federal court has no authority to issue a declaratory judgment apart from that authority granted it by the Declaratory Judgment Act, which requires by its terms that an 'actual controversy' exists between the parties before the court." *Gladwell Governmental Servs., Inc v. Cnty. of Marin*, No. C-04-3332 SBA, 2005 WL 2656964, at *1 (N.D. Cal. Oct. 17, 2005) (citing 28 U.S.C. § 2201; *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240 (1937)); *Benitec Aus. Ltd v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007) (holding that the party asserting claims under the Declaratory Judgment Act bears the burden of demonstrating the facts alleged involve a "substantial" controversy of "sufficient immediacy" to warrant a declaratory judgment (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007))). The "actual controversy" must be extant through *all* stages of litigation, not just at the time the claims are filed. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). Courts routinely find "that declaratory relief claims are moot when their mirror image counterclaims are dismissed with prejudice." *See QuickLogic Corp. v. Konda Techs., Inc.*, No. 5:21-cv-4657-EJD, 2023 WL 5182598, at *4 (N.D. Cal. Aug. 11, 2023).

Because the Court has dismissed with prejudice Defendants' mirror image counterclaims of direct and indirect infringement under the Copyright Act, Westhoff's responsive counterclaims for non-infringement are moot. *Cf. QuickLogic*, 2023 WL 5182598, at *4 (dismissing as moot non-infringement declaratory judgment counterclaims on the ground mirror image infringement claims were dismissed with prejudice); *E-Tool Dev.*, 2018 WL 2208428, at *1 (similar); *Pom Wonderful*, 2016 WL 5920103, at *2 (similar). Accordingly, the Court **DISMISSES AS MOOT** Counts Two through Eight of Westhoff's Counterclaim and **TERMINATES** Defendants' Motion for the same reason.[13]

---

[13] The Court **TERMINATES** Westhoff's *ex parte* request to file a sur-reply. (ECF No. 27.)

**D.   Defendants' Anti-SLAPP Motion is Inapplicable to the Counterclaims and Allegations They Seek to Strike**

Defendants move to strike from the record Counts Two through Eight of Westhoff's Countercomplaint, as well as their supporting factual allegations. (Anti-SLAPP Mot.) This Motion is brought under California's Anti-SLAPP statute—not Rule 12(f). (*Id.* at 2:7–13 (citing Cal. Civ. Proc. Code § 425.16).)

California's Anti-SLAPP statute is intended to "provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1055–56 (2006). The Anti-SLAPP law provides, in relevant part:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16. Anti-SLAPP motions are not limited to attacks on entire claims, but may also "attack parts of a count, including specific allegations amounting to a claim." *Newport Harbor Offices & Marina, LLC v. Morris Cerullo World Evangelism*, 23 Cal. App. 5th 28, 43 (2018); *Sheley v. Harrop*, 9 Cal. App. 5th 1147, 1175 (2017) ("Allegations of a protected activity supporting stricken claims are to be eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing.").

California's anti-SLAPP "does not apply to federal law causes of action." *Hilton v. Hallmark Cards*, 599 F.3d 894, 900–01 (9th Cir. 2010); *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 955 (9th Cir. 2013); *but see Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 63 F. Supp. 2d 1127, 1130 (N.D. Cal. 1999) ("[T]he anti-SLAPP statute may be applied to state law claims which, as in this case, are asserted pendent to federal question claims." (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *United States ex rel.*

- 30 -

*Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999)).  Counts Two through Eight seek declaratory judgment based on the federal Declaratory Judgment Act.  (*See* Pl.'s CC ¶ 1 ("Westhoff seeks declaratory judgment of inequitable conduct and unclean hands preventing enforcement of Defendants' registered copyrights pursuant to 28 U.S.C. §§ 2201 and 2202."); *see Gladwell Governmental Servs.*, 2005 WL 2656964, at *1 (holding that federal courts lack authority "to issue a declaratory judgment apart from that authority granted it by the Declaratory Judgment Act").  California's Anti-SLAPP statute, therefore, is inapposite to these causes of action.  *Cf. Finato v. Keith Fink & Assocs.*, No. 2:16-CV-6713-RGK-AJW, 2017 WL 10716999, at *5 (C.D. Cal. May 5, 2017) (denying Anti-SLAPP motion directed at claims under the Declaratory Judgment Act); *Summit Media LLC v. City of Los Angeles*, 530 F. Supp. 2d 1084, 1095 (C.D. Cal. 2008) ("CBSO's single counter claim is brought under 28 U.S.C. § 2201 . . ., which is a federal cause of action seeking declaratory relief.  The cause of action for which Plaintiff seek[s] anti-SLAPP relief involves exclusively federal law claims.  Therefore, the California statute is not an applicable relief."); *Mireskandari v. Daily Mail & Gen. Trust PLC*, No. CV 12-2943 MMM (SSx), 2013 WL 12114762, at *9 n.37 (similar).

Accordingly, the Court **DENIES** Defendants' Anti-SLAPP Motion.[14]

## III.   CONCLUSION

For the aforementioned reasons, the Court:

1.   **GRANTS** Westhoff's Motion (ECF No. 29) and **DISMISSES** Defendants' Amended Countercomplaint (ECF No. 13).

2.   **GRANTS** Defendants **LEAVE TO AMEND** their counterclaim of unfair business practices under California Business and Professions Code § 17200 to the extent it is premised on defamation only.  All the remaining claims in Defendants' Amended Countercomplaint are dismissed **WITH PREJUDICE**.

---

[14] The Court also **DENIES** as procedurally improper Westhoff's request for Rule 11 sanctions, which it posits at the end of its Opposition.  (*See* Opp'n to Anti-SLAPP Mot. at 9:2–7); *see* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).  The motion must be served under Rule 5[.]").

3.     **DISMISSES AS MOOT** Counts Two through Eight of Westhoff's Countercomplaint (ECF No. 21) and **TERMINATES** Defendants' Motion to Dismiss (ECF No. 22) and Westhoff's Motion for Leave to file a Sur-reply (ECF No. 27) for the same reason.

4.     **DENIES** Defendants' Anti-SLAPP Motion (ECF No. 31).

5.     **ORDERS** Defendants to file their Second Amended Countercomplaint **by no later than <u>September 28, 2023</u>**, and Westhoff to respond **by no later than <u>October 19, 2023</u>**.

**IT IS SO ORDERED.**

DATED: **September 6, 2023**

Hon. Cynthia Bashant
United States District Judge

- 32 -

22cv0938