**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTHOFF VERTRIEBSGES MBH, | Case No. 22-cv-0938-BAS-SBC |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| CHRISTOPHER BERG; BLUESKYE CREATIVE, INC., | |
| Defendants. | |

This matter was set for a bench trial, which took place on April 6, 7, and 13, 2026. The Court heard and took evidence presented at trial. Based upon full consideration of the testimony received, exhibits admitted into evidence, and arguments presented by the parties, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

At trial, Plaintiff Westhoff Vertriebsges mbH ("Westhoff") called two witnesses: Christian Westhoff ("Mr. Westhoff") and Christopher Berg ("Mr. Berg"). Defendants Mr. Berg and BlueSkye Creative, Inc. ("BlueSkye")—in addition to Mr. Westhoff and Mr. Berg—called two witnesses: Susan Bernotas, BlueSkye's accountant, and Nichalas Farella, a BlueSkye employee who interned for Westhoff.

- 1 -

22cv0938

This matter proceeded to trial on three issues: (1) breach of fiduciary duty, (2) intentional misrepresentation, and (3) the equitable remedy of an accounting. During closing arguments, Westhoff abandoned the request for an accounting.

## I.    FINDINGS OF FACT[1]

### Background

1.    Westhoff is a German-based family-owned and operated flower-breeding company founded in 1955.

2.    Mr. Westhoff is the General Manager of Westhoff.

3.    Westhoff retains forty (40) to eighty (80) employees, depending on the season.

4.    Mr. Westhoff visits the United States a couple of times a year.

5.    The North American market produces 50% of Westhoff's global licensing income.

### Westhoff Hires Mr. Berg

6.    Around February 2014, Westhoff engaged Mr. Berg to serve as its agent with respect to Westhoff's sales and marketing in North America.

7.    In an oral agreement, Westhoff agreed to pay Mr. Berg $8,000.00 a month, plus reimbursement for out-of-pocket expenses.

8.    The parties entered into an informal reimbursement arrangement. Westhoff gave Mr. Berg discretion over spending. No budget was discussed. Westhoff did not impose a numeric cap on expenses. The parties did not define what constituted reimbursable expenses. Mr. Westhoff testified that he did not want to be Mr. Berg's "babysitter" when it came to spending.[2] If Westhoff considered an expense inappropriate, he raised the issue ad hoc with Mr. Berg.

---

[1] To the extent that a finding is characterized as one of law but is more properly characterized as one of fact (or vice versa), substance will prevail over form.

[2] For example, Mr. Berg decided which growers or trials to travel to, how long he would stay there, which hotel to stay at, and the logistics of rental cars and flights.

22cv0938

9.     Westhoff relied on Mr. Berg to handle sales, customer relations, marketing, and strategic business development in North America. Mr. Berg was given broad responsibilities and discretion for Westhoff corporate decisions in North America.

10.     Mr. Berg represented Westhoff in a confidential litigation matter—namely, a settlement with Proven Winners. In that case, BlueSkye/Berg received a $65,000.00 settlement on Westhoff's behalf. (Ex. 550; *see also* Ex. 547.) Mr. Westhoff credibly testified that Mr. Berg was involved in the negotiation and settlement process, directed the attorneys, and corresponded with opposing counsel.

11.     Mr. Berg was the only representative Westhoff engaged in the United States; Westhoff had no other U.S. employees, U.S. agents, or U.S. offices.

12.     Westhoff depended on Mr. Berg for financial reporting and expense documentation for the monthly invoices and later the Chase credit card statements, discussed below.

13.     During his representation of Westhoff, Mr. Berg continued to represent other clients.

14.     The parties' relationship lasted for four and a half years, terminating around late September/early November of 2018.

15.     Around the time the parties' relationship ended, Mr. Berg wrote in an email to Mr. Westhoff: "I wanted to let you know that as of November 1st, we will no longer be able to represent Westhoff to the market. I appreciate the last 4.5 years we've worked together, as we've definitely made our mark on the industry. In the future, BlueSkye Creative will be available for marketing projects such as catalogs, photoshoots, trade shows, etc., just not doing actual representation in the industry." (Ex. 275.)

16.     After the parties' relationship ended, Mr. Berg filed a complaint with the State of California Department of Industrial Relations Labor Commissioner's Office regarding his representation of Westhoff. (Ex. 242.)

22cv0938

**Formation of BlueSkye Creative**

17. In March 2014, shortly after Westhoff engaged Mr. Berg as its North American representative, Mr. Berg incorporated BlueSkye Creative, Inc. in California—a marketing company formed, at least in part, to carry out Westhoff's business.

18. Mr. Berg was the Founder and President of BlueSkye.

19. Mr. Berg was the sole owner, director, and officer of BlueSkye.

20. Mr. Berg was the sole shareholder of BlueSkye; the company issued one share that belonged to Mr. Berg.

21. Mr. Berg and BlueSkye have shared counsel throughout this litigation, as well as in the bankruptcy litigation.

22. Mr. Berg and BlueSkye share the same address.

23. During his employment with Westhoff, Mr. Berg operated interchangeably under his personal name and BlueSkye. For example, the Chase financial documents, discussed below, included the names of Christopher Berg and BlueSkye Creative. (Exs. 3, 7.)

24. Although Mr. Berg made some attempts to maintain separate accounts, he also commingled his personal account with BlueSkye accounts.

25. Westhoff paid the monthly $8,000.00 marketing fee it offered to Mr. Berg to BlueSkye.

**Structure of Out-of-Pocket Expenses**

26. As mentioned, Westhoff agreed to reimburse Mr. Berg for out-of-pocket expenses. Mr. Berg sought reimbursement through two methods—he either charged a Westhoff credit card, or he submitted invoices to Westhoff.

Credit Card

27. The credit card reimbursement method changed over the course of the relationship. Initially, Westhoff issued Mr. Berg a Westhoff corporate Lufthansa credit card. The Lufthansa credit card ending in #4427 was issued in the name of Christopher

22cv0938

Berg/Westhoff Vertriebsges. Only Mr. Westhoff, his brother Heiner Westhoff, and one other family member had Lufthansa business credit cards issued in their name at Westhoff.

28. Mr. Berg's monthly Lufthansa credit card statements were directly available to Mr. Westhoff given that it was a company-issued card.

29. Mr. Berg used the Lufthansa credit card from 2014 to 2017. The credit card statements were sent directly to and paid for by Westhoff.

30. Then, starting in February 2017, Mr. Berg opened a BlueSkye business account with JP Morgan Chase Bank.

31. Mr. Berg opened a BlueSkye Chase Ink credit card ending in #9423 in the name of Christopher Berg/BlueSkye Creative. Mr. Berg also opened a BlueSkye checking account ending in #8205. (Ex. 276.)

32. In an email to Westhoff, Mr. Berg stated that he intended to use the #9423 credit card for Westhoff expenses instead of the Lufthansa card. Mr. Berg specifically assured Westhoff that the #9423 credit card would be used for "100% Westhoff" expenses. (Ex. 276.) Mr. Berg stated in full: "Basically this account is just to sub out the Lufthansa card for any expenses that are 100% Westhoff and I'll want to keep it clean for accounting purposes." (Ex. 276.)

33. Instead of sending the credit card statements directly to Westhoff for payment, Mr. Berg asked Westhoff to wire funds to the #8205 checking account. Mr. Berg stated that he would use the #8205 checking account to pay off the #9423 credit card statements. (Ex. 550.) In an email to Mr. Westhoff, Mr. Berg wrote: "[The #8205 checking account] is used only for payment of the Westhoff credit card or occasionally a wire transfer, but there are no checks for this account. For this reason, we will invoice Westhoff if I have to issue a check to a vendor (CSU, McHutchison, etc.) from the BlueSkye account." (Ex. 550.)

34. Westhoff agreed to this arrangement. Westhoff periodically transferred money into the #8205 checking account to enable Mr. Berg to pay for the expenses charged to the #9423 credit card. When asked why he agreed to this arrangement, Mr. Westhoff

22cv0938

testified that he did so as a favor to Mr. Berg, as it was presented as easier for Mr. Berg to manage.

35.    Between 2017 to 2018, Westhoff deposited $30,000.00 into the #8205 checking account eight times. (*See, e.g.*, Exs. 234, 243.) Westhoff directly wired a total of $240,000.00 into the #8205 checking account.

36.    In the separate Proven Winners litigation, as discussed, Westhoff received a $65,000.00 settlement that Mr. Berg accepted on Westhoff's behalf. Mr. Berg deposited $40,000.00 into the #8205 checking account. (Ex. 550.) Mr. Berg said he would use the other $25,000.00 to pay off an outstanding Westhoff invoice. (Ex. 550.)

37.    Thus, over the course of the parties' relationship, Westhoff funded $280,000.00 into the #8205 checking account.

38.    Starting in 2017, Mr. Berg would send the monthly #9423 credit card statements by email to Westhoff. Mr. Westhoff would review these credit card statements, paying most attention to the total amount spent. Mr. Westhoff trusted that the charges were 100% Westhoff related.

39.    At one point, Mr. Westhoff testified that he asked for log-in information for the BlueSkye Chase bank account. (Ex. 244.) Mr. Berg did not provide access because there was more than one account behind the log-in credentials.[3] Mr. Westhoff found this explanation reasonable.

40.    Mr. Berg used the #9423 credit card from 2017 to 2018.

41.    At the end of the parties' relationship, the total drawn from the #8205 checking account was $251,421.17, with a remaining balance of $28,578.83.

---

[3] As discussed, Mr. Berg opened the #9423 credit card and the #8205 checking account specifically for Westhoff expenses. The other accounts behind the BlueSkye Chase bank account can be categorized as follows. To start, Mr. Berg had a BlueSkye operating account ending in #0550, along with an unidentified BlueSkye operating credit card. Further, Mr. Berg testified that there was another Westhoff bank account ending in #9601 for a 2018 greenhouse project. Finally, there was a BlueSkye savings account, apparently opened as part of the account setup.

42. Mr. Berg did not return the remaining funds to Westhoff after the relationship ended. Instead, Mr. Berg effectively transferred some of the remaining funds to himself and/or BlueSkye, discussed below. Moreover, there still appears to be around $9,941.01 in unaccounted funds within the #8205 checking account.

Invoices

43. The #9423 credit card, paid off by the corresponding #8205 checking account, was not the sole method by which Westhoff compensated Mr. Berg's out-of-pocket expenses. For expenses that could not be paid by credit card, Mr. Berg invoiced Westhoff directly.[4]

**Activity of Out-of-Pocket Expenses**

44. Regarding Mr. Berg's out-of-pocket expenses, the Court finds the following evidence relevant to intentional fraudulent activity and/or breach of fiduciary duty.

Personal Charges on the #9423 Credit Card Statement

45. Mr. Berg represented to Westhoff that he would use the #9423 credit card for "100% Westhoff" expenses; however, Mr. Berg admitted to several personal charges on the #9423 credit card. Mr. Berg made select admissions to personal charges on the #9423 credit card between 2017 to 2018. (Ex. 272.)

46. Westhoff discussed the following list of expenses on the #9423 credit card. (Ex. 272.) Westhoff identified these charges as personal expenses, a characterization Mr. Berg partially confirmed through admissions made during discovery. (Exs. 272, 541.) Having reviewed the list, and based on all the testimony presented, the Court finds all of the following expenses were personal and not chargeable to the #9423 credit card:

- 6/4/17 Amazon               $17.22
- 7/21/17 Lyft                $22.19
- 7/21/17 Lyft                $9.91
- 7/22/17 Lyft                $16.07

---

[4] The Court notes that the $8,000.00 marketing fees were paid through separate, monthly invoices.

- • 7/23/17 Lyft $12.64
- • 8/27/17 Lyft $11.58
- • 9/9/17 Lyft $12.12
- • 9/10/17 Lyft $17.13
- • 9/10/17 Lyft $11.88
- • 9/10/17 Lyft $11.82
- • 9/11/17 Lyft $11.37
- • 9/19/17 Amazon $47.20
- • 9/19/17 Amazon $59.68
- • 9/29/17 Amazon $159.48
- • 10/2/17 Lyft $9.20
- • 10/12/17 Lyft $6.25
- • 10/13/17 Lyft $15.17
- • 10/13/17 Lyft $6.25
- • 10/14/17 Lyft $12.92
- • 10/14/17 Lyft $11.39
- • 10/22/17 Lyft $57.72
- • 10/29/17 Lyft $16.38
- • 10/30/17 Amazon $31.78
- • 11/3/17 Lyft $6.60
- • 11/5/17 Lyft $6.60
- • 11/17/17 Amazon $89.55
- • 11/28/17 Amazon $107.40
- • 12/2/17 Amazon $12.91
- • 12/2/17 Amazon $138.74
- • 12/5/17 Lyft $14.95
- • 12/6/17 Lyft $12.09
- • 12/9/17 Lyft $6.25

22cv0938

- 12/8/17 Lyft     $23.49
- 12/10/17 Lyft     $7.43
- 12/11/17 Hampton Suites     $33.00
- 12/23/17 Lyft     $36.95
- 12/23/17 Lyft     $6.25
- 12/24/17 Lyft     $6.25
- 12/24/17 Lyft     $7.83
- 12/25/17 Lyft     $8.78
- 12/26/17 Lyft     $78.68
- 12/27/17 Lyft     $9.66
- 12/28/17 Lyft     $14.01
- 1/5/18 Lyft     $13.97
- 3/4/18 Amazon video on demand     $3.99
- 4/28/18 Amazon video on demand     $34.99
- 5/29/18 Avis Rent-a-car     $347.72
- 5/31/18 Amazon     $24.45
- 6/24/18 Amazon video on demand     $3.99
- 7/2/18 Amazon     $20.22
- 7/3/18 Amazon     $51.17
- 7/23/18 Lyft     $10.99

47. These charges, totaling $1,726.26, were never revealed to Westhoff as personal until litigation commenced. Mr. Berg has not repaid Westhoff for the personal expenses he incorrectly charged to Westhoff.

48. Although Mr. Berg says he inadvertently billed these personal expenses to Westhoff, the Court finds the personal billings intentional given the number of personal

22cv0938

expenses billed, the variation in the charges, as well as the fact that they continued for an extended period.[5]

49.    Over the course of the parties' relationship, the Court finds that Mr. Berg incurred many significant expenses on Westhoff's behalf and many of the expenses billed to Westhoff either via credit card or by invoice were for legitimate expenses.

50.    Besides those personal expenses by Mr. Berg enumerated above, the Court rejects the inference that other charges to the #9423 credit card or invoices were personal or general BlueSkye operating expenses. Berg offered credible explanations at trial establishing that the charges Plaintiff characterized as personal were legitimate Westhoff expenses. (*See* Ex. 541.)

Double Invoice

51.    Westhoff paid Invoice No. 1375, in the amount of $4,997.19, twice. (Ex. 192.) Invoice No. 1375 shows up as paid on Westhoff's ledger both on 19/06/2017 and 13/04/2017. (Ex. 234.) Westhoff asked Mr. Berg to return $4,997.19 as a mistaken double payment. (Ex. 240.)

52.    During litigation, around 2020, Mr. Berg produced Invoice No. 1396, which allegedly invoiced Westhoff for $4,997.19 in 2017. (Ex. 197.) In other words, Mr. Berg claimed he sent Westhoff Invoice No. 1375 for $4,997.19 and Invoice No. 1396 for $4,997.19 in 2017.

53.    Mr. Westhoff credibly testified that he did not receive Invoice No. 1396 in 2017; instead, Mr. Westhoff testified he saw Invoice No. 1396 for the first time during litigation.

54.    Mr. Berg produced no documentation or receipts supporting the legitimacy of Invoice No. 1396. Just because Mr. Westhoff may know of Lux Containers and Ecopods

---

[5] Westhoff also presented evidence of electronic withdrawals from the #8205 checking account that did not correspond to payments to pay off the #9423 credit card, (*see, e.g.*, Ex. 40); however, Plaintiff has neither shown nor raised an inference that these withdrawals of funds were personal/fraudulent.

22cv0938

does not mean Mr. Berg submitted a legitimate invoice. Further, the Court finds the precision of the payments—$4,997.19 to the cent—to be beyond coincidence.

55.    The Court finds Mr. Berg intentionally manufactured Invoice No. 1396 to keep the $4,997.19 from Westhoff's mistaken double payment.

<u>Forged #9423 Credit Card Statement and Accompanying Forged Receipt</u>

56.    Mr. Berg forged a #9423 credit card statement that he sent to Westhoff in January of 2018. (*Compare* Ex. 1, *with* Ex. 19; *see also* Ex. 274.)

57.    As discussed, Mr. Berg made several personal Lyft charges to the #9423 credit card. In the forged credit card statement, Mr. Berg doctored the credit card statement, taking off $182.36 in personal Lyft expenses. (Ex. 1 at 3.) Mr. Berg then rearranged the remaining entries to follow successively.

58.    Also, to cover the difference, Mr. Berg falsified the PayPal Processing Inc. charge on the same credit card statement. (Ex. 1 at 3.) The actual amount owed to Processing Inc. was $3,928.02, but Mr. Berg admits to changing this total to $4,110.38.

59.    Mr. Berg further forged the attached Processing Inc. Invoice to reflect the higher amount of $4,110.38. (Ex. 1 at 10.) Mr. Berg admitted to editing this invoice with Adobe. The alteration from $3,928.02 to $4,110.38 covers the $182.36 in personal Lyft expenses.

60.    Mr. Berg made two other alterations to this credit card statement. First, Mr. Berg intentionally altered a United Airlines $588.00 charge to state that the flight was from San Diego to Denver, a location where Westhoff had business relations. (Ex. 1 at 3.) In reality, the credit card statement indicates that the flight was from San Diego to Chicago. Mr. Berg testified that he was visiting a Westhoff-related customer in Denver and added that he remembers the visit because it was one of the only times he offered to go to Denver when it snowed. The Court does not find Mr. Berg's testimony credible.

61.    Second, Mr. Berg altered the location of a Hilton Hotel reservation charge of $113.91, omitting reference to O'Hare, Chicago. (Ex. 1 at 3.) Mr. Berg testified he was not in Chicago at that time. The Court does not find Mr. Berg's testimony credible.

22cv0938

62. Mr. Berg paid the full amount of the forged credit card statement from the Westhoff-funded #8205 bank account.

63. Although Mr. Berg says he made the changes to the forged credit card at Mr. Westhoff's behest, the Court does not find Mr. Berg's testimony credible. And there is no coherent reason that Mr. Westhoff would ask Mr. Berg to change the apparently personal Hilton Hotel stay in and United Airline flight to Chicago.

"PAC Commission" Invoice

64. Several months after the parties' relationship ended, on January 1, 2019, Mr. Berg created Invoice No. 1574 for an amount of $13,742.45. (Ex. 233.) The amount was allegedly owed to Mr. Berg as a bonus or a commission for the 2018 sale season.

65. Mr. Westhoff credibly testified that he did not receive Invoice No. 1574. Mr. Westhoff also credibly testified that he did not owe or pay Mr. Berg a bonus or a commission for 2018 sales.

66. A few months later, on March 14, 2019, Mr. Berg withdrew $13,742.45 from the #8205 checking account to pay off Invoice No. 1574. (Ex. 65.) While invoices were usually sent to and paid off by Westhoff, here, Mr. Berg used the #8205 checking account to pay off Invoice No. 1574. As discussed, the #8205 checking account was created to reimburse #9423 credit card statements, not invoices.

67. Whether or not the parties entered into an agreement to pay Mr. Berg a bonus or a commission, Mr. Berg inappropriately used the #8205 checking account to pay off Invoice No. 1574 that Westhoff never approved.[6]

---

[6] During the trial, the parties debated whether the amount in Invoice No. 1574 constituted a "bonus" or a "commission."

Plaintiff argued that Westhoff previously paid Mr. Berg a discretionary bonus for the 2017 season, which was calculated based on royalty numbers. (Ex. 212.) Mr. Westhoff further testified that he did not intend to give Mr. Berg a bonus for the 2018 season because of unsatisfactory performance and, generally, no commission was expected. (*See* Ex. 238.)

But Defendants seek to characterize this payment as an expected commission. Mr. Berg asked Mr. Westhoff repeatedly for the royalty numbers, presumably to calculate a commission percent, but Mr. Westhoff delayed providing the numbers. Regardless of whether the Court categorizes the payment as a

- 12 -

Other Transfers from the #8205 Checking Account

68.     Again, many months after the parties' relationship ended, on June 4, 2019, Mr. Berg transferred out of the #8205 checking account $4,895.28. (Ex. 64.)

69.     Mr. Berg testified that the $4,895.28 was used to pay off outstanding Westhoff invoices/charges that Ms. Bernotas had marked as unpaid; these charges allegedly included hotel cancellations, subscriptions, and October travel expenses.

70.     Mr. Berg provided no documentation or receipts for the $4,895.28 withdrawal. Nor did Mr. Berg send Westhoff a breakdown of the $4,895.28 charges. And Mr. Berg did not explain why the money was transferred to himself.

71.     The Court does not find that the $4,895.28 withdrawal constitutes legitimate Westhoff expenses.

**Westhoff's Inadequate Requests for Documentation/Receipts**

72.     At the start of the relationship, the parties had no written notices or other communication signaling required reimbursement documentation.

73.     The evidence showed that Westhoff made select requests for receipts or brief explanations, which Mr. Berg provided at times. (*See, e.g.*, Exs. 573(C), (D).)

74.     The evidence further showed that Westhoff began to ask for credit card statements and related receipts after the switch from the Lufthansa to the Chase credit card. In a February 2018 email to Westhoff's accountant, Simone Rensing, Mr. Berg objected to her request for pre-2018 receipts, suggesting that he had been told at the outset that receipt retention would not be required. (*See* Ex. 246; *see also* Ex. 573-A.)

75.     Nevertheless, in an email to Mr. Westhoff in February 2018, Mr. Berg stated, under the header "Credit Card Statement" that: "As discussed, we'll begin sending these monthly now with receipts for your records." (Ex. 550.)

---

bonus or a commission, Mr. Berg intentionally misappropriated earmarked Westhoff funds to pay off Invoice No. 1574.

22cv0938

76. The record is equally unclear as to what invoice receipts Westhoff required and when. While the record reflects a 2018 email where Mr. Westhoff asks Mr. Berg for receipts for invoices, Plaintiff did not present earlier requests. (Ex. 573-B.)

77. Regardless of whether Westhoff clearly told Mr. Berg to provide receipts and whether Mr. Berg gave continued assurances that he would soon provide documentation and whether attaching receipts is standard business practice, over the span of four and a half (4.5) years, Westhoff kept paying off the invoices and paying off the credit card statements or funding the #8205 checking account.

78. Occasionally, someone from Westhoff would ask Mr. Berg for a receipt or an explanation of a particular expense, but on the whole Mr. Berg was reimbursed when he submitted a charge to Westhoff.

79. Over many years and hundreds of thousands of dollars in disbursements, Westhoff had repeated opportunity to condition payment on receipt of documentation—yet it never did so, continuing instead to pay invoices and fund the #8205 account.

**No German Tax Issue**

80. Mr. Westhoff claims that, without receipts, he may have issues with the German tax authorities if he gets audited. But Plaintiff failed to present evidence as to what documentation German tax authorities would or would not accept or how much Westhoff might lose if these business expenses turn out to be non-deductible.

**Access to the #0550 Account and QuickBooks**

81. During discovery, Mr. Berg successfully filed a motion to quash Westhoff's subpoena to the #0550 Chase account by filing a declaration under penalty of perjury stating that the #0550 bank account was "used for all BlueSkye business *except* Westhoff expenses, into which Westhoff *never* advanced funds." (Ex. 334.)

82. But when Westhoff settled the Proven Winners lawsuit for $65,000.00, a $40,000.00 portion of the settlement was transferred into the #0550 operating account.

83. In addition, at least three transfers were made from the #8205 to the #0550 account, allegedly to pay Westhoff expenses. On April 27, 2018, $1,551.21 was transferred

- 14 -

22cv0938

from #8205 to #0550, allegedly to pay for a China trip Mr. Berg took on behalf of Westhoff. On June 6, 2018, $3,141.00 was transferred from #8205 to #0550, allegedly for shared freight for the MAST Young Plant Broker Samples. And, on December 19, 2018, $54.00 was transferred from #8205 to #0550 for undisclosed reasons. Westhoff was unable to obtain the #0550 records.

84.    In addition, BlueSkye accountant Ms. Bernotas testified that Mr. Berg kept all receipts for reimbursable expenses in a drawer, and that she would later upload those receipts to QuickBooks. (Ex. 244.) Her testimony suggests that the QuickBooks records could verify all receipts for the expenses.[7] Unfortunately, Mr. Berg never produced the QuickBooks records in discovery and, given that Mr. Berg eventually declared bankruptcy, the QuickBooks records are not currently available. For this reason, Westhoff's counsel admitted during closing argument that the accounting request in the original Complaint is no longer a viable remedy.

85.    Plaintiff neither sought discovery sanctions nor moved to reopen discovery with respect to these incidents.

## II.    CONCLUSIONS OF LAW

### A.    Breach of Fiduciary Duty

The elements of breach of fiduciary duty are (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. *See Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995).

Mr. Berg did not act as an arms-length independent contractor.

Instead, Mr. Berg voluntarily accepted and assumed the confidence of Westhoff to represent Westhoff within the North American market as its agent and to manage the funds in Westhoff's best interest. *See Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1338 (2012).

---

[7] Once, Ms. Bernotas attempted to forward the invoices to Westhoff from QuickBooks with the receipts attached; Mr. Berg told her not to do so anymore supposedly because the emails could be intercepted by German tax authorities. Mr. Berg indicated he would email relevant receipts when requested instead.

22cv0938

Of note, Mr. Berg had exclusive control over the financial records and misused his access to Westhoff's funds both during and after the relationship terminated. *See Vai v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 56 Cal. 2d 329, 338 (1961) ("[I]f an individual continues to control property of the other he is held to the duties of a fiduciary as long as he retains such control, notwithstanding the termination of the confidential relationship."). And Westhoff relied on Mr. Berg for accurate accounting and proper handling of its funds based on Mr. Berg's assurances. Although a breach of fiduciary duty can occur through mere negligence, here the Court finds all the breaches were intentional.

Mr. Berg breached his position of trust when he withdrew $13,742.45 for the alleged "PAC Commission" and an additional $4,895.28 from the #8205 checking account. Mr. Berg further violated that trust when he did not return the estimated $9,941.01 remaining funds within the #8205 checking account.

Mr. Berg's breach of fiduciary duty proximately caused Westhoff damage.

**B.      Intentional Misrepresentation**

The elements of intentional misrepresentation are (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *See All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).

Mr. Berg represented to Westhoff that the #9423 credit card would be used for 100% Westhoff expenses; yet Mr. Berg made repeated personal expenses on the #9423 credit card. Mr. Berg also falsely submitted Invoice No. 1396 to justify the $4,997.19 double payment. And Mr. Berg forged a bank credit card statement and related receipt to cover personal charges. Mr. Berg had knowledge or reckless disregard of the actual falsity. Mr. Berg intended to induce Westhoff to rely on the falsity. And Westhoff reasonably relied on the falsity.

As a result of Mr. Berg's intentional misrepresentation, Westhoff suffered damage.

22cv0938

### C.      Piercing the Corporate Veil

To pierce the corporate veil, a court must find (1) such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and that, if the acts are treated as those of the corporation alone, (2) an inequitable result will follow. *See Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985).

Factors courts consider to determine unity of interest include (a) commingling of funds and assets of the two entities; (b) identical equitable ownership in the two entities; (c) use of the same offices and employees; (d) disregard of corporate formalities; (e) identical directors and officers; and (f) use of one as a mere shell or conduit for the affairs of the other. *See Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1108–09 (2013) (citation omitted); *see also Wehlage v. EmpRes Healthcare, Inc.*, 791 F. Supp. 2d 774, 782 (N.D. Cal. 2011).

Here, unity of interest is established by the following factors: Mr. Berg was the sole owner, director, and officer of BlueSkye; Mr. Berg was the sole shareholder of BlueSkye; Mr. Berg and BlueSkye have shared counsel throughout the present action; Mr. Berg and BlueSkye share the same address; Mr. Berg operated under his personal name and BlueSkye in financial documents; and Westhoff paid the monthly $8,000.00 marketing fee it had offered to Mr. Berg to BlueSkye.

Moreover, adherence to the fiction of corporate separateness would produce an inequitable result given the findings of fraud. *See Curci Invs., LLC v. Baldwin*, 14 Cal. App. 5th 214, 221 (2017) ("Reverse veil piercing is similar to traditional veil piercing in that when the ends of justice so require, a court will disregard the separation between an individual and a business entity.").

The Court therefore pierces the corporate veil and holds Mr. Berg's assets available to satisfy the judgment entered against Defendants.

### III.     CONCLUSION AND DAMAGES

The following damages are awarded pursuant to the findings of (1) breach of fiduciary duty and (2) intentional misrepresentation.

22cv0938

• Mr. Berg is liable for $1,726.26 in personal charges to the #9423 credit card. (Ex. 272.)[8]

• Mr. Berg is liable for the $4,997.19 in double payment of Invoice No. 1375. (Ex. 234.)

• Mr. Berg is liable for $21,864.15, the total of the falsified credit card statement. (*Compare* Ex. 1, *with* Ex. 19.)

• Mr. Berg must repay the $28,578.83 remaining in the #8205 checking account around when the parties' relationship ended.

Total = $57,166.43.[9]

Under Rule 54(d), an attorney's fee motion is not due until fourteen days after the entry of judgment.

Under Cal. Civ. Code § 3294(a), a court may award punitive damages: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Plaintiff did not request punitive damages in the Pretrial Conference Order. Thus, the Court will not exercise its discretion to award punitive damages to make an example of or to punish Defendants in this case.

The Clerk of Court shall close the case.

**IT IS SO ORDERED.**

**DATED: May 29, 2026**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

---

[8] The Court declines to award Plaintiff the additional $11,012.07 for the alleged "personal" expenses charged to the #9423 credit card because Plaintiff has not shown that the non-admitted charges were personal.

[9] Westhoff also seeks $388,000.00 in compensatory damages for invoices lacking documentation, ranging in date from 2014 to 2019. (Ex. 541.) The Court declines to award these damages. Westhoff did not credibly identify invoice expenses that he believes Mr. Berg submitted for non-Westhoff expenses. And Westhoff continued to pay off the invoices for hundreds of thousands of dollars over the span of four and a half (4.5) years without receipts.

22cv0938